UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

JOHN S. PEREIRA, CHAPTER 7 TRUSTEE, FOR THE : 
BANKRUPTCY ESTATE OF PAWEL CAPALA, :

                                    :          REPORT &
                Plaintiff,       :          RECOMMENDATION
                                      :          17-CV-3434 (ILG) (SMG)
    -against-                         :

                                      :

PAWEL CAPALA, JENNIFER CAPALA, and FIRE : 
HILL HOLDINGS, LLC, :

                                      :

               Defendants.      :

-------------------------------------------------------------------- x

GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

John S. Pereira ("plaintiff" and/or the "Trustee), as the Chapter 7 Trustee for the

Bankruptcy Estate of Pawel Capala (the "Estate"), brings this action against Pawel Capala

("Pawel" and/or the "Debtor"), Jennifer Capala ("Jennifer"), and Fire Hill Holdings, LLC ("Fire

Hill Holdings") (collectively the "defendants" except where the context makes clear that the

reference is only to the individual defendants), pursuant to Title 11 of the United States Code

(the "Bankruptcy Code"), 11 U.S.C. §§ 363(f), 363(h), 542(a), 544, 546, 550.  Compl. at 1, Dkt.

1.  Plaintiff alleges that the Debtor fraudulently transferred three properties to defendants

Jennifer and Fire Hill Holdings in violation of New York Debtor and Creditor Law ("DCL")

Sections 273-a and 276.  *Id.* ¶ 1.  Plaintiff seeks a judgment avoiding the transfers of the

properties and requiring the turnover of the Debtor's interest in the properties to the Estate

pursuant to 11 U.S.C. § 542.  *Id.*  An Order entered by the Bankruptcy Court withdrew the

reference to that Court to permit the Trustee to pursue this fraudulent conveyance litigation here.

Compl. Ex. A ¶ 7, Dkt. 1-3.

Plaintiff now moves for summary judgment on three grounds: 1) the Debtor, Pawel, conveyed the properties to Jennifer without fair consideration in violation of DCL § 273-a; 2) the Debtor conveyed the properties with actual intent to hinder, delay, or defraud his creditors in violation of DCL § 276; and 3) Jennifer has failed to carry her burden of proof with respect to her separate property affirmative defense.  Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem. Supp.") at 1, 18, Dkt. 69.  Defendants oppose plaintiff's motion and cross-move for summary judgment primarily on two grounds: 1) Pawel received "reasonably equivalent value" for the conveyances, especially in light of Jennifer's separate property contributions to the acquisition and renovation of the most valuable of the properties and the purchase of one of the others; and 2) the defendants' divorce judgment, given the absence of extrinsic fraud, conclusively establishes that there was "reasonably equivalent value" exchanged by Pawel for the properties.  Defs.' Joint Br. in Supp. of their Cross-Mot. for Summ. J. ("Defs.' Mem. Supp.") at 10–13, 15–16, Dkt. 75.

United States District Judge I. Leo Glasser has referred the parties' cross-motions to me for report and recommendation.  Dkt. 98.  Having considered the submissions of the parties, I respectfully recommend that the parties' cross-motions for summary judgment be denied in all respects.

## BACKGROUND

### I.   Factual Allegations

#### A.   *Undisputed Facts*[1]

On May 13, 2013, a jury returned a verdict against defendant Pawel Capala, his business

partner Robert Capala, and their business, Capala Brothers, Inc. (collectively, the "*Gortat*

defendants") in *Gortat et al v. Capala Brothers, et al.*, 07-CV-3629 (ILG) (SMG) (E.D.N.Y.

Nov. 6, 2018) (the "*Gortat* Litigation"). Pl.'s Statement of Material Facts in Supp. of its Mot.

for Summ. J. ("Pl.'s SOF") ¶ 1, Dkt. 70. On June 19, 2013, the District Court entered judgment

against the *Gortat* defendants, jointly and severally, in the amount of $293,212.41. *Id.* ¶ 2. That

judgment was amended on February 13, 2017, to include an award of attorneys' fees in the

amount of $508,554 and costs in the amount of $57,869.50. *Id.* ¶ 10. Defendants, however,

became aware of the magnitude of the likely fee award on August 4, 2014, when Judge Glasser

initially adopted my Report and Recommendation regarding attorneys' fees. *See Gortat et al v.

Capala Brothers, et al.*, 07-CV-3629 (ILG) (SMG), Dkt. 423, (E.D.N.Y filed Aug. 4, 2014).

Pawel filed for bankruptcy protection on June 12, 2015. Pl.'s SOF ¶ 9. The amended *Gortat*

judgment has not been paid. *Id.* ¶ 11.

On May 28, 2013, following the jury verdict but before the Court entered the original

judgment, Jennifer incorporated Fire Hill Holdings. *Id.* ¶ 3. Less than one week later, on June 3,

2013, Jennifer and Pawel executed a "Separation and Property Settlement Agreement" (the "First

2013 Separation Agreement"). *Id.* ¶ 4; Joint Statement of Material Facts in Supp. of Defs.' Joint

---

[1] The facts in this section are primarily drawn from Pl.'s Statement of Material Facts in Supp. of its Mot. for Summ.
J. ("Pl.'s SOF"), Dkt. 70, to the extent they are admitted in Defs.' Counter-Statement of Facts in Opp. to Pl.'s Mot.
for Summ. J. and Statement of Facts in Supp. of Cross-Mot. for Summ. J. at 1–3 ("Defs.' SOF Opp.") ¶ 1, Dkt. 76.
Note, however, that the first paragraph in Defs.' SOF Opp. refers to paragraph numbers not included in Pl.'s SOF.
*Compare* Pl.'s SOF (only twenty-two paragraphs) *with* Defs.' SOF Opp. (referencing paragraphs 23–26). This
section is based on the undisputed paragraphs to the extent that they *do* correspond.

Mot. for Summ. J. at 4–16 ("Defs.' SOF") ¶ 4, Dkt. 76; First 2013 Separation Agreement[2] at 9, Dkt. 71-4.  Jennifer commenced a divorce action on June 13, 2013, and the couple was divorced by judgment of the New York Columbia County Supreme Court on December 18, 2013.  Defs.' SOF ¶¶ 26–27; Judgment of Divorce ("2013 Divorce Judgment"), Dkt. 77-2; 2013 Findings of Fact and Conclusions of Law ("2013 FOF"), Dkt. 71-7.  The divorce judgement was intended to incorporate the parties' separation agreement.  2013 Divorce Judgment ¶ 29; *see also* Defs.' Counter-Statement of Facts in Opp. to Pl.'s Mot. for Summ. J. and Statement of Facts in Supp. of Cross-Mot. for Summ. J. at 1–3 ("Defs.' SOF Opp.") ¶ 5, Dkt. 76.

The separation agreement transferred three jointly owned properties—each of which was acquired during the marriage, Defs.' SOF ¶¶ 10, 32, 44, 50—to Jennifer, "free and clear of any right, title, or interest of Pawel Capala."  Pl.'s SOF ¶ 4.  The three properties are 246 Frost Street, Brooklyn ("Brooklyn"), 152 Fire Hill Road, Spencertown, New York ("Spencertown"), and Stagecoach Road, Hillsdale, New York ("Hillsdale").  *Id.*  The separation agreement attributes estimated values of $1,500,000 to Brooklyn, $300,000 to Spencertown, and $100,000 to Hillsdale.  First 2013 Separation Agreement Art. V.  The transfers were executed on June 3, 2013, less than a week after the jury verdict in the *Gortat* litigation.  Pl.'s SOF ¶ 7.  Both the Brooklyn and Hillsdale properties were transferred to Fire Hill Holdings for the stated consideration of $1.  Deeds[3] at 3, 13, Dkt. 71-6.

---

[2] The page numbers are not included in the document but refer to the PDF filed on ECF, Dkt. 71-4.
[3] The page numbers are not included in the document but refer to the PDF filed on ECF, Dkt. 71-6.

*B. Disputed Facts*

1. Defendants' Version of the Facts

Defendants' telling of the facts begins with Pawel and Jennifer's marriage in 1994.

Defs.' SOF ¶ 10.  At that time, Pawel worked in construction and Jennifer was employed as a

freelance photographer.  Aff. of Jennifer Capala in Opp. to Pl.'s Mot. for Summ. J. and in Supp.

of Defs.' Mot. for Summ. J. ("Jennifer Aff.") ¶ 4, Dkt. 78.  Pawel left his construction job soon

after the marriage to start his own business, Capala Brothers, Inc, but earned very little to no

income from 1996 to 2001.  Defs.' SOF ¶¶ 11–12.  Pawel's lack of regular income was an early

"source of friction" between the spouses, though Pawel's finances did become more stable in

2005.  Jennifer Aff. ¶ 5.

Before 2005, the couple depended on Jennifer's family wealth in the form of dividends

from her pre-marital investment account and annual gifts from her mother.  *Id.* ¶ 6.  In 1996,

Pawel and Jennifer purchased the Brooklyn property with funds from her investment account,

which at the time held $350,000 in stock.  *Id.* ¶¶ 8–9.  Jennifer liquidated $80,000 in stock for a

down payment on the Brooklyn property and sold additional stock to fund at least $108,000 of

renovations to it.  *Id.* ¶¶ 10–11.  The investment account consisted of stock titled only in

Jennifer's maiden name; the account itself was held under Jennifer's maiden name until her

marriage to Pawel, when the account name was changed to Jennifer Capala.  *Id.* ¶ 9.  The

defendants maintain that the account was their only possible source of "extra" money at this

stage of their marriage.  *Id.* ¶ 11; Aff. of Pawel Capala in Opp. to Pl.'s Mot. for Summ. J. and in

Supp. of Defs.' Mot. for Summ. J. ("Pawel Aff.") ¶¶ 13–15, Dkt. 79.  In 2002, Jennifer also used

funds she received as a distribution from a trust created by her grandmother to purchase the

Hillsdale property for $70,000.  Jennifer Aff. ¶ 25.  The Hillsdale property is vacant land to

which no improvements have been made since the purchase. *Id.* ¶ 27.  Pawel acknowledges that "without the money from Jennifer's family that was given to her before [they] were married and during [their] marriage, [they] would not have owned either the Brooklyn Property or the Hillsdale Property as [Pawel] contributed no monies to the acquisition of either property and [Pawel] did not pay for any of the renovations made at the Brooklyn Property."  Pawel Aff. ¶ 11.

Jennifer and Pawel have two sons.  Defs.' SOF ¶ 10.  The couple lived in the Brooklyn property with their sons until 2007, when Jennifer moved to Spencertown.  Jennifer Aff. ¶ 12.  Both spouses purchased Spencertown in 2006.  Pawel Aff. ¶ 18.  Jennifer's move was "generated by the fact that [the] marital relationship had become extremely strained as a result of multiple disputes over [Pawel's] lack of significant contribution to family finances, and his stress and drinking."  Jennifer Aff. ¶ 12.

The marriage continued to deteriorate.  In 2009 Pawel began an affair with a woman named Danusia and, though Jennifer was unaware of the affair at the time, she asked for a divorce in 2010.  Defs.' SOF ¶¶ 16–17.  Pawel "begged" Jennifer to stay in the marriage and she "reluctantly agreed for the sake of [the] children."  *Id.* ¶ 18; Jennifer Aff. ¶ 47.  However, Jennifer's "suspicions of and eventual discovery of [Pawel's] apparently long-term affair…in the Spring of 2013 pushed [them] apart permanently" and led to her "insist[ing] upon a divorce."  *Id.* ¶¶ 46, 48.  Even before she discovered Pawel's affair, Jennifer pointed to the "apparent disconnect in [their] backgrounds," Pawel being an "immigrant, with poor language skills" and Jennifer coming from "a Washington society upbringing," as contributing to their marital friction.  *Id.* ¶¶ 44–45.

Jennifer initiated the action for divorce on June 13, 2013, in the New York Columbia County Supreme Court (the "County Court").  Defs.' SOF ¶ 26.  Prior to doing so, Jennifer

drafted the couple's First 2013 Separation Agreement using Legal Zoom software and without the assistance of counsel.  Jennifer Aff. ¶¶ 49, 51.  Jennifer intended to "keep what was [hers]" and to allow Pawel "to trade his interests in the Subject Properties for a waiver of his obligation for maintenance, support, educational expenses and [her] choice not to pursue an interest in his business."  *Id.* ¶ 49.

When Pawel came to visit on June 3, 2013, Jennifer showed him the agreement and he agreed to execute it in front of a notary at a local bank.  *Id.* ¶¶ 50–51.  Pawel understood the agreement as allowing him to "carry on without obligation to Jennifer or [his] Children [and] to try and rescue [his] business."  Pawel Aff. ¶ 34.  Pawel was aware that the agreement transferred the Brooklyn and Hillsdale properties to Jennifer, which Pawel always thought of as "belonging to her notwithstanding the presence of [his] name on the deed."  *Id.* ¶ 11.  Pawel did not initially realize, though, that the agreement transferred Spencertown.  *Id.* ¶ 32.  The First 2013 Separation Agreement stated that Pawel would owe Jennifer only $25 per month until 2025 rather than the "presumptive amount of child support attributable to the non-custodial parents" of $5,385.50 per month.  First 2013 Separation Agreement Art. IV (A).  The agreement further provided that Jennifer would be responsible for all extracurricular activity expenses, educational expenses, and out-of-pocket health care costs.  *Id.* Art. IV (C)–(E).

The First 2013 Separation Agreement, however, failed to satisfy the County Court.  Specifically, Judge Richard Mott would not grant the divorce "because of a problem in the Agreement with the mandatory disclosures for child support."  Jennifer Aff. ¶ 54; *see* First 2013 Separation Agreement Art. IV (A).  Jennifer retained a lawyer for the limited purpose of helping her correct any errors in the original agreement and prepare a second agreement (the "Second 2013 Separation Agreement").  Jennifer Aff. ¶ 55; *see* Second 2013 Separation Agreement, Dkt.

71-5.  This version contains several handwritten edits.  Most notably, it alters the first agreement by reducing the presumptive amount of monthly child support owed from $5385.50 to $1,877 and increasing the amount Pawel would be required to pay from $25 to $1,877; the provision stating that the agreement deviates from the basic child support obligation is also crossed out.  *Id.* Art. IV (A).  The Second 2013 Separation Agreement was never properly executed and is therefore missing the final pages included in the First 2013 Separation Agreement with Jennifer and Pawel's notarized signatures.  Jennifer Aff. ¶ 57; *see* Second 2013 Separation Agreement.

Still, Jennifer proceeded to submit the Second 2013 Separation Agreement, along with other necessary forms, to the County Court on December 13, 2013.  *Id.* ¶ 58; 2013 FOF[4] at 1. Judge Mott signed the forms on December 18, 2013, and the 2013 Divorce Judgment issued. Jennifer Aff. ¶ 63.  The corresponding Findings of Fact—the 2013 FOF—state that Pawel agreed to pay $1,703.42 per month as opposed to the presumptive amount of child support owed, listed as $1,724.  2013 FOF ¶ 21(B)(3).  The 2013 FOF further state that the parties entered into the separation agreement on December 11, 2013, which is actually the date that Jennifer went to the Clerk's Office for assistance in filling out forms.  Jennifer Aff. ¶¶ 59, 62; 2013 FOF ¶¶ 18, 21(B)(3), 26(A).

On October 23, 2018, Jennifer's counsel in this action filed a motion in the County Court to correct the 2013 Divorce Judgment.  2018 Divorce Motion, Dkt. 71-14.  The stated purpose was to "correctly identify and incorporate but not merge the parties' Separation and Property Settlement Agreement dated June 3, 2013," which had been incorrectly dated December 11, 2013, and to "correctly state the agreement between the parties with respect to child support and statutory add-ons including the cost of education of the parties' children and health insurance for

---

[4] The page numbers are not included in the document but refer to the PDF filed on ECF, Dkt. 71-7.

the children," which had been altered following the initial execution of the First 2013 Separation Agreement. *Id.* at 1. The court granted the re-settlement motion on November 2, 2018, and issued a corrected judgment of divorce declaring:

> [T]his Corrected Judgment is issued *nunc pro tunc*, and for the express purpose of correcting and restating the initial Judgment of Divorce issued in this matter dated December 18, 2013…and shall relate back to and be enforceable as of the date of that initial Judgment of Divorce as if it were originally issued on that date.

Corrected Judgment of Divorce ("2018 Divorce Judgment") at 8, Dkt. 71-16. The Corrected Findings of Fact issued by the court at the same time acknowledge the errors in the 2013 Divorce Judgment:

> Somehow, the Final Divorce Papers were filled out either by Court staff or the staff in the County Clerk's Office using pre-printed forms and check boxes and the Final Divorce Papers completely misstated both the date of the parties' Agreement to be incorporated into the Judgment of Divorce and misstates the parties['] agreement with respect to child support contained in the Agreement and did not address the Court's issues with respect to disclosure or the proper reasons for deviation from the Child Support Standards Act contained in the Agreement.

Corrected Findings of Fact and Conclusions of Law ("2018 FOF") ¶ 14, Dkt. 71-15. The 2018 FOF adjust the parties' agreement with respect to child support to better reflect the First 2013 Separation Agreement; specifically, the 2018 FOF provide that Pawel will pay only $25 per month for child support rather than the presumptively correct child support obligation of $2,112 per month. *Id.* at 8–9; *see also* 2018 Divorce Judgment at 7 (ordering the stated child support agreement into effect). Under the 2018 FOF and 2018 Divorce Judgment—through their incorporation of the First 2013 Separation Agreement—Jennifer also waives her right to alimony and any contribution from Pawel to the children's extracurricular activity expenses, education expenses, and uninsured medical costs. 2018 Divorce Judgment at 7; First 2013 Separation Agreement Art II, Art. IV (C)–(E)

By the time the 2018 Divorce Judgment issued, Pawel and Jennifer had, according to defendants, been living apart for several years.  In 2013, immediately after Jennifer learned Pawel was having an affair, Pawel moved to a guest home in the backyard of the Spencertown property.  Jennifer Aff. ¶ 68.  After the divorce, Pawel lived in Austerlitz, New York, not far from Spencertown, for approximately two years where he "bartered work for the opportunity to live in a cabin apartment"; he spent free time with his girlfriend in Hudson, New York.  *Id.*; Pawel Aff. ¶¶ 40, 43.  Pawel continues to receive mail at the Spencertown address "because of the itinerant nature of [his] living arrangements" and Jennifer allows Pawel to stay in the guest house when visiting their sons.  *Id.* ¶¶ 41–42; Jennifer Aff. ¶¶ 67–68.  Though Pawel briefly moved to Poland in September 2018, he returned at the request of Jennifer and one of his sons after that son was suspended from school.  Pawel Aff. ¶¶ 41–42.  Most recently, Jennifer suggested that Pawel stay in the guest house until their son's problems are resolved.  *Id.* ¶ 42.

## 2.  Plaintiff's Version of the Facts

Plaintiff contends that Pawel and Jennifer executed a separation agreement and divorced as part of a scheme "to secrete assets from the reach of [Pawel's] soon-to-be judgment creditors" in the *Gortat* litigation.  Pl.'s Mem. in Opp. to Defs.' Cross-Mot. for Summ. J. and in Further Supp. of Mot. for Summ. J. ("Pl.'s Mem. Opp.") at 1–2, Dkt. 90.  First, plaintiff asserts that defendants' statements concerning the couple's initial separation in 2007, Jennifer's request for a divorce in 2010, the temporary reconciliation, and the couple's final decision to divorce, are contradicted by the deposition testimony of Jennifer's mother, Gesine Krogh.  Pl.'s Counter-Statement of Material Facts in Opp. to Defs.' Cross-Mot. for Summ. J. ("Pl.'s SOF Opp.") ¶¶ 13–14, 17–18, Dkt. 92.  Ms. Krogh testified that Jennifer never mentioned the possibility of divorcing Pawel to her until after the divorce took place.  *Id.*; Suppl. Dep. Of Gesine Krogh

("Krogh Dep.") at 102:14–103:25, Dkt. 83-1.  Next, plaintiff disputes defendants' claim that

Pawel began having an affair in 2009 because the affair is not mentioned in Pawel's Affidavit.

Pl.'s SOF Opp. ¶ 16; *see* Pawel Aff. ¶ 43.  *But see id.* ¶¶ 6, 9 (referencing the affair).  Finally,

plaintiff stresses that even following the couple's divorce, Pawel continued to reside at the

Spencertown property.  Pl.'s SOF ¶ 14.  Specifically, plaintiff points to Jennifer's deposition

testimony that she and Pawel "are at the same address" and Pawel's deposition testimony that he

had been living at that the Spencertown property from mid-2016 until the time of the deposition

in 2018.  Pl.'s Mem. Supp. at 10; Excerpt of Jennifer Capala Dep. ("Jennifer Dep. Excerpt") at

139:9-11, Dkt. 71-17; Excerpt of Pawel Capala Dep. ("Pawel Dep. Excerpt") at 95:22–96:2, Dkt.

71-18.[5]

      Plaintiff characterizes Jennifer's separate property defense—her claim the Pawel was

never entitled to much of the property transferred because she acquired it with family money—as

yet another attempt to shield the couple's assets from Pawel's creditors.  *See* Pl.'s Mem. Opp. at

3.  Although Jennifer and Pawel attest in their affidavits to Jennifer's use of her family money to

acquire the Brooklyn property, plaintiff asserts that under New York law, "a spouse's testimony

that funds used to acquire marital property were that spouses' separate property unsupported by

documentary evidence, is insufficient to overcome the [] presumption [of marital property]."

Pl.'s SOF Opp. ¶¶ 34–37.  Plaintiff further points out that, at her deposition, Jennifer "testified

that funds from her joint account with Pawel Capala may have been used to purchase" the

---

[5] As discussed above, defendants do not deny that Pawel spends time at the Spencertown address but explain that he stays in a guest house to be close to his children.  *See* Reply Affidavit of Jennifer Capala ¶ 24, Dkt. 95 ("Our sole remaining connection is the children and our boys have affection for their father which is why I permit him to be around then and to stay periodically at the guest house on the Spencertown Property where they live"); Pawel Aff. ¶¶ 39–44 (explaining that he stays at the Spencertown guest house to visit his sons and continues to receive mail at that property due to his "itinerant nature of [] living arrangements").

Brooklyn property. *Id.* ¶¶ 34–35.  Likewise, "the record evidence produced by Defendants establishes that the cost of the renovations to the Brooklyn property were actually paid from funds from the Capala's joint banking account…not from Jennifer's Capala's pre-marital account." *Id.* ¶¶ 36–37.

Finally, plaintiff disputes the defendants' purported justification for the 2018 Divorce Motion.  In response to defendants' assertion that the initial divorce judgment "contained several errors," Defs.' SOF ¶ 27, plaintiff points out that "neither the Debtor nor Defendant Jennifer Capala claimed that the [2013 Divorce] Judgment was erroneous for five years until the instant adversary proceeding was commenced."  Pl.'s SOF Opp. ¶ 27; *see also* Pl.'s Mem. Supp. at 16, n. 15. (describing the resettlement motion as a last-minute "attempt to retroactively modify the terms of the consideration relevant to the claims in this litigation, in order to better Defendants' position and change the facts in their favor").  More generally, plaintiff objects to defendants' characterization of the 2013 Divorce Judgment as re-settled and corrected, as enforceable "as of the date of the" 2013 Divorce Judgment, and as incorporating the parties' separation agreement, Defs.' SOF ¶¶ 27–30, on the basis that the defendants' factual statements contain legal conclusions, are argumentative, and fail to cite to admissible evidence, *see* Pl.'s SOF Opp. ¶¶ 27–30.

## II.    Prior Motions

Earlier in this litigation, two issues arose relating to the defendants' legal representation. I describe them here because they have some bearing on the parties' cross-motions for summary judgment.

First, about nine months after the Trustee commenced the present action, Jennifer retained new counsel, Michael Assaf, and filed a Motion to Amend/Correct/Supplement her

Answer and change venue.  Dkt. 34.  Jennifer and Pawel had previously been represented by the same attorney, Gabriel Del Virginia.  *See* Answer, Dkt. 10.  In her motion, Jennifer explained that, prior to retaining her own attorney, she "did not understand [her] rights and interests and how the same were impacted by the choices Pawel and Mr. Del Virginia made" and that there was a "conflict of interest issue with respect to Mr. Del Virginia's representation of all defendants in this action."  Aff. of Jennifer Capala in Supp. of Mot. to Amend Answer ¶¶ 3–4, Dkt. 34-1.  I granted Jennifer's motion to amend.  Dkt. 53.  Of relevance here, Jennifer asserts a separate property affirmative defense in her Amended Answer.  Am. Answer ¶¶ 33–34 (Sixth Affirmative Defense), Dkt. 54.  In addition, it was after Jennifer retained separate counsel that she and Pawel moved to resettle their original judgment of divorce and merge their original separation agreement into the 2018 Divorce Judgment.

Next, after an order adopting the parties' proposed briefing schedule for their summary judgment motions, plaintiff filed a letter to the Court concerning defendants' 2018 Divorce Judgement.  Ltr. Regarding Nov. 8, 2018, Correspondence from Mr. Assaf, Dkt. 60.  Plaintiff alleged that defendants gave "no formal notice" of the motion filed in the County Court to re-settle the 2013 Divorce Judgment.  *Id.* at 2.  Plaintiff then moved to compel disclosure of the motion papers filed in the state proceedings and to allow for the possibility of reopening discovery.  Ltr. Regarding Mr. Assaf's Resp. Ltr. dated Nov. 13, 2018, at 5, Dkt. 63.  Defendants' response to plaintiff's letter attempted to justify the motion for re-settlement based upon the errors described in defendants' Statement of Facts, Ltr. in Resp. to Mr. Campo's Letter dated Nov. 9, 2018, Dkt. 62, and ultimately asserted the common interest privilege to avoid revealing communications between the attorneys representing Pawel and Jennifer in connection with the re-settlement of the 2013 Divorce Judgment, Defs.' Brief on the Issue of Pl.'s

Entitlement to Commc'ns Between Counsel at 2, Dkt. 82.  Defendants asserted this privilege on the basis of their shared common interest in preserving the separation agreement and defeating the Trustee's claims.  *Id.* at 4.

I rejected defendants' argument that those communications were privileged and ordered disclosure.  Order of Apr. 16, 2019 at 8–9, Dkt. 99.  I then gave the parties an opportunity to supplement their briefing in light of the disclosed communications.  Apparently, nothing in those communications was helpful to plaintiff because no additional briefing was submitted.

## DISCUSSION

## I.    Standards Governing Summary Judgment

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)*; see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Whether an issue of fact is material is determined by the applicable substantive law.  *Id*.  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

If a moving party makes the showing required by Rule 56, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Id.*  "When evaluating the record to determine whether summary judgment is appropriate, [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Mizrahi v. City of New York*, 2018 WL 3848917, at *5 (E.D.N.Y. Aug. 13, 2018) (internal quotation marks and citation omitted).  However, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant."  *Powell v. Nat'l Bd. of Med.*

*Exam.*, 364 F.3d 79, 84 (2d Cir. 2004).  Thus, "[i]n essence … the [court's] inquiry is … whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52; *see also Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) ("The role of the court in deciding a motion for summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." (internal quotation marks and citation omitted)).

The analysis is no different when parties cross-move for summary judgment.  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).  "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party."  *Morales*, 249 F.3d at 121 (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## II.    Plaintiff's Motion for Summary Judgment

Section 544 of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. 544(b)(1).  "The 'applicable law' in determining which obligations are voidable under Section 544(b)(1) is often state law."  *In re Palermo*, 739 F.3d 99, 101–02 (2d Cir. 2014).  Here, New York fraudulent conveyance law, specifically New York Debtor and Creditor Law ("DCL"), §§ 270–281, applies.  *See In re Thilman*, 557 B.R. 294, 298 n. 5 (Bankr. E.D.N.Y. 2016).

Two of the three prongs advanced in plaintiff's motion for summary judgment are that defendants' transfers of real property are voidable pursuant to DCL Sections 273-a and 276.[6]  A debtor's transfer may be set aside pursuant to Section 273-a if it is shown to be constructively fraudulent, without regard "to any showing of actual motive or intent to defraud on the part of the transferor."  *Ross Prod. Div. Abbott Labs. Inc. v. Saper*, 2007 WL 9710316, at *3 (E.D.N.Y. Sept. 27, 2007) (citing *Gallagher v. Kirschner*, 220 A.D.2d 948 (3d Dep't 1995)).  Section 276, in contrast, avoids conveyances that are actually fraudulent, or made "with actual intent . . . to hinder, delay, or defraud" a creditor.  N.Y. Debt. & Cred. Law § 276.  Because the question of actual fraudulent intent presents "a factual question involving the parties' states of mind," courts are often unable to resolve Section 276 claims on summary judgment.  *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201–02 (2d Cir. 1991).

The third prong of plaintiff's motion challenges Jennifer's affirmative defense, which claims that "Pawel's entitlement to the subject properties and the value of what was transferred must account for Jennifer's separate property."  Defs.' Joint Brief in Opp. to Pl.'s Mot. For Summ. J. ("Defs.' Mem. Opp.") at 10, Dkt. 80.  New York Domestic Relations Law defines separate property as "property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse."  N.Y. Dom. Rel. § 236(B)(1)(d)(1).  New York's Domestic Relations Law further provides that "[s]eparate property shall remain such," whereas marital property "shall be distributed equitably between the parties."  N.Y. Dom. Rel. § 236(B)(5)(b)–(c).  Jennifer interposes this affirmative defense in an effort to show that the

---

[6] New York's Debtor and Creditor Law was amended effective April 4, 2020.  What had been DCL Section 276 is now largely restated in Section 273(a)(1), and the gist of what had been Section 273-a, at least insofar as relevant here, is now set forth in Section 273(a)(2).  The revisions apply only to transfers made after their effective date. 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) at 9, § 7, https://www.nysenate.gov/legislation/bills/2019/a5622. Accordingly, this Report and Recommendation applies the provisions of the DCL in effect prior to the recent amendments.

property transfers are not subject to challenge as lacking in consideration but rather were made,

"in whole or in part, [in] recognition of [her] substantial separate property."  *See* Am. Answer ¶¶

33, 41, 45.  Jennifer further argues that, because her interest in the properties is legitimate, it

should be protected from Pawel's creditors.  *Id.* ¶ 34.

I discuss each of these three aspects of plaintiff's motion below.  In sum, though plaintiff

mounts a strong case, I conclude that material questions of fact preclude summary judgment.

*A.  DCL § 273-a*

Section 273-a of the New York Debtor and Creditor Law provides that

> [e]very conveyance made without fair consideration when the person making it is
> a defendant in an action for money damages or a judgment in such an action has
> been docketed against him, is fraudulent as to the plaintiff in that action without
> regard to the actual intent of the defendant if, after final judgment for the plaintiff,
> the defendant fails to satisfy the judgment.

N.Y. Debt. & Cred. Law § 273-a.  "To prevail under that section, 'a plaintiff must establish (1)

that the conveyance was made without fair consideration; (2) that the conveyor is a defendant in

an action for money damages or that a judgment in such action has been docketed against him;

and (3) that the defendant has failed to satisfy the judgment.'"  *Mitchell v. Garrison Protective*

*Servs., Inc.*, 819 F.3d 636, 641 (2d. Cir. 2016) (quoting *Mitchell v. Garrison Protective Servs.,*

*Inc.*, 579 F. App'x 18, 21 (2d Cir. 2014)).

There is no dispute that, at the time the properties were conveyed, Pawel, the Debtor, was

a defendant in the *Gortat* litigation, a suit for money damages brought under the Fair Labor

Standards Act, or that the judgment in that case remains unsatisfied.  Thus, the only element at

issue is whether the conveyances to Jennifer were made for fair consideration.

Generally, the burden of proving the absence of fair consideration rests with the party

challenging the conveyance.  *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994).

However, the burden shifts to the transferee when the conveyance is an intra-family transfer that

17

either lacks tangible consideration or is a "clandestine transfer…designed to conceal the nature and value of consideration." *Id.* at 325. Conversely, the burden will not shift, even when the case involves an intra-family transfer, if "the evidence of the specific value and nature of the consideration [i]s available to the creditor and the only issue to be decided is whether the value of that consideration approaches the fair market value of the property in issue." *Id.* at 324.

Here, while the properties at issue were conveyed from one spouse to another, they were transferred pursuant to the terms of a separation agreement incorporated in a divorce judgment, readily available to Pawel's creditors. It further appears, at least on the surface, that the only debate is whether the exchange memorialized in the separation agreement amounts to fair consideration, and that there is not a substantial dispute over the fair market value of the properties conveyed to Jennifer and Fire Hill Holdings. Nonetheless, where, as here, the conveyed properties and relevant joint bank accounts were in defendants' names, courts have shifted the burden to the transferors. *See In re Lindsay*, 2010 WL 1780065, at *6 (Bankr. S.D.N.Y. May 4, 2010) (shifting the burden to the Debtor since the "facts surrounding the consideration are in the Debtor's control: The house was in Debtor's name, the Debtor's name was on the joint bank account and stocks …[and] the transfer was between family members").

There is also some indication in Jennifer's deposition testimony that the parties did not abide by the plain terms of the separation agreement as incorporated in the 2013 Divorce Judgment. *See* Complete Dep. of Jennifer Capala at 81:10–82:25, Dkt. 77-11 (suggesting that Jennifer did not hold Pawel to his child support obligations in the first or second separation agreement). Moreover, though Jennifer received tangible consideration in this exchange, Pawel received intangible consideration in the form of legal waivers. Under these circumstances, the burden is properly shifted to defendants to "come forward with sufficient evidence to raise a

triable issue of fact as to the existence" of fair consideration.  *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 843 (2d Cir. 1999).

"Fair consideration" is given for property:

    (a)  When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

    (b)  When such property, or obligation, is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. Law § 272.[7]  Thus, for there to be fair consideration, "(1)…the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be in 'good faith.'"  *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005) (quoting *HBE Leasing Corp. v. Frank ("HBE Leasing II")*, 61 F.3d 1054, 1058–59 (2d Cir. 1995)).  When evaluating these elements, courts are cognizant that fair consideration is determined on a case-by-case basis and "does not require dollar-for-dollar equivalence."  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 377 (S.D.N.Y. 2003), *abrogated on other grounds by Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16, 22 (2d Cir. 2019).[8]

---

[7] As indicated above with respect to Sections 273-a and 276, this Report applies the provisions of New York's Debtor and Creditor Law as they were prior to the amendments that became effective on April 4, 2020.

[8] I consider these elements in the context of the defendants' 2018 Divorce Judgment, which incorporates the First 2013 Separation agreement.  Though it is apparent that Second 2013 Separation Agreement—the agreement incorporated in the 2013 Divorce Judgment—results in Pawel receiving less consideration for the properties because it obligates him to pay the statutorily calculated amount of child support, *see* Second 2013 Separation Agreement Art. IV (A), the 2018 Divorce Judgment and Findings of Fact removes the Second 2013 Separation Agreement from this Court's consideration.  *See Hamilton v. Hamilton-Grinols*, 363 F. App'x 767, 769 (2d Cir. 2010) (instructing district courts to leave issues that are "matrimonial in nature" to the expertise of state courts); *In re Chester A. Ciancarelli*, 96-CV-3931, slip op. at 25 (E.D.N.Y. Dec. 16, 1997) (noting, in response to the Trustee's argument that "the property distribution was totally inequitable," that the district court "is without jurisdiction to review the adequacy of a distributive award made in a divorce proceeding.").  Moreover, as indicated in the text, it appears that Pawel never paid the child support required by the second separation agreement, and that Jennifer never took steps to require him to do so.

1.  <u>Property Conveyed or Antecedent Debt Satisfied</u>

The question presented by the first element is whether, as a matter of law, Jennifer's

waiver of child support obligations and spousal support amounts to satisfaction of an "antecedent

debt," and may thus serve as "consideration" for the property transfers.  Generally, contingent

promises and promises of future support are "insufficient as a matter of law to be considered a

fair equivalent of the property transferred."  *In re Corcoran*, 246 B.R. 152, 163 (E.D.N.Y. 2000);

*see also HBE Leasing II*, 61 F.3d at 1060.  However, "[i]n the domestic relations context, it is

well settled in New York that a husband's obligation to support his wife is *an antecedent debt*

sufficient to satisfy the definition of fair consideration."  *Fed. Deposit Ins. Co. v. Malin*, 802

F.2d 12, 18 (2d Cir. 1986) (emphasis added); *see also In re Ciancarelli*, 96-CV-3931, slip. op. at

17 (E.D.N.Y. Dec. 16, 1997) (characterizing ex-wife as a "creditor to [husband's pension and

retirement] benefits, which accrued during the course of the marriage").

It is thus clear that a husband's transfer of property to his ex-wife in exchange for her

waiver of child support, alimony, or inheritance rights may be a transfer that is supported by fair

consideration.  *See United States v. Nirelli*, 1997 WL 718443, at *3 (W.D.N.Y. Sept. 16, 1997)

(stating that "[t]he transfer to an ex-wife by a husband of all of his interest in marital property as

payment for child support is not a fraud on creditors, as it is supported by valid consideration");

*Commodity Futures Trading Com'n v. Walsh ("Walsh IV")*, 3 F. Supp. 3d 70, 75 (S.D.N.Y.

2014) (same with respect to alimony and inheritance rights).  An actual divorce judgment is

necessary to give these waivers concrete value.  *See In re Fair*, 142 B.R. 628, 632 (Bankr.

E.D.N.Y. 1992) (differentiating transfer "allegedly made to solve marital difficulties" from

transfer made pursuant to a "voluntary divorce settlement in which the parties went their separate

ways, and the wife waived her right to maintenance in exchange for the transfer").  Accordingly,

because Jennifer's waivers of spousal support and child support, including extracurricular expenses, education expenses, and uninsured medical costs, were made pursuant to the First 2013 Separation Agreement and later incorporated in the 2018 Divorce Judgement, the waivers may serve as consideration for the property transfers. *See* 2018 Divorce Judgement at 7; First 2013 Separation Agreement Art II, Art. IV (C)–(E).

Plaintiff disputes, in particular, whether the waiver of educational expenses, as opposed to legally enforceable obligations like child support, may constitute consideration and cites to cases for the proposition that "support for [a] child's education is not mandatory." Pl.'s Mem. Supp. at 17 (citing *Lynn v. Kroenung*, 97 A.D.3d 822, 823 (2d Dep't 2012) and *Cimons v. Cimons*, 53 A.D.3d 125, 127 (2d Dep't 2008)). While a court need not require parents to contribute to their children's education expenses, it may, in its discretion, impose such a requirement pursuant to a divorce decree. *See Cimons*, 53 A.D.3d at 127, 130–31 (college tuition); *Poznik v. Froebel*, 1 A.D.3d 366, 367 (2d Dep't 2003) (private education). The same is true for other kinds of support a family court may award, such as alimony. *See* N.Y. Dom. Rel. § 236(A)(1) ("In any action or proceeding brought…for a separation, or [] for a divorce, the court may direct either spouse to provide suitably for the support of the other as, *in the court's discretion*, justice requires") (emphasis added)). Still, courts have found that waivers of these obligations pursuant to voluntary settlement agreements may serve as consideration. *In re Fair*, 142 B.R. at 631 (holding that husband's transfer of property in exchange for the wife's agreement "to forego any claim for maintenance in return for the conveyance, is a transfer for fair consideration"); *Farkas v D'Oca*, 2002 WL 35634808, at *1–*2 (N.Y. Sup. Ct. Feb. 06, 2002) (rejecting plaintiff's argument that spousal support, child support, and education expenses, which were voluntarily paid, could only be construed as consideration up to the amount the ex-

21

wife would have received in family court), *aff'd, Farkas v. D'Oca*, 305 A.D.2d 237 (1st Dep't 2003).

Plaintiff further argues that the waiver of educational expenses was "illusory" and cannot constitute fair consideration because Pawel could never have afforded his sons' private school or college tuition, and Jennifer acknowledged in her deposition that those expenses were paid with rental income from the Brooklyn property and gifts from her Mother.  Pl.'s Mem. Supp. at 17. But ability to pay is not the measure of consideration; it is the surrender of a legally enforceable obligation that supports consideration, either in the form of "a benefit to the promisor *or* a detriment of the promisee."  *Formica Const. Co. v. Mills*, 801 N.Y.S.2d 713, 718 (Civ. Ct. 2005); *see also Holt v. Feigenbaum*, 52 N.Y.2d 291, 293 (N.Y. 1981) (concluding "that there was sufficient consideration…notwithstanding the fact that defendant may have enjoyed no direct benefit as a result of the bargain").  Here, Jennifer waived her rights to pursue alimony, child support, and tuition expenses—to her legal detriment—in exchange for Pawel's transfer of his property interests; whether or not Pawel could have in fact paid those amounts does not alter the conclusion that value was exchanged.

2.  Exchange of Fair Equivalent Value

The second element requires the Court to consider whether the value conveyed to Pawel under the separation agreement was the 'fair equivalent' of the property transferred to Jennifer. With respect to the value of the transferred properties, and as noted above, defendants' First Separation Agreement attributed estimated values of $1,500,000 to Brooklyn, $300,000 to Spencertown, and $100,000 to Hillsdale.  In their Statement of Facts, defendants cite to appraisals of the properties and identify the liens on them as well.  The appraised value for Brooklyn in 2013, when Pawel and Jennifer were divorced, was $1,900,000, and the property

was encumbered by loans totaling approximately $325,000; the appraised value for Hillsdale was $70,000, and it was unencumbered; and the appraised value for Spencertown was $280,000, and it was encumbered by loans totaling approximately $191,000.  Defs.' SOF ¶¶ 38–53.  The net value of the three properties, then, was approximately $1,734,000; half of that amount— presumably what would be Pawel's share if the properties were divided equally—totals approximately $867,000.

Also as discussed above, Jennifer waived her right to impose on Pawel any obligation to pay maintenance, support, or educational expenses for the couple's children and any right to pursue an interest in Pawel's business.  The 2018 Divorce Judgment required Pawel to pay only $25 per month in child support while noting that the presumptively correct child support obligation was $2,112 per month.  Defendants have submitted an expert report that attributes values, based upon alternative assumptions, to the obligations Pawel avoided pursuant to the 2018 Divorce Judgment.  Defs.' Expert Report at 5–6, Dkt. 77-10.  The more conservative assumption results in a child support obligation of $2,061 per month; defendants' expert also assumes that the couple's two children would continue their private school education and attend college at a state school.  *Id.* at 5.  Based on these assumptions, the expert estimates that Pawel avoided obligations exceeding $750,000.  *Id.* at 5–6.[9]

Generally, "the assessment of fair equivalent value requires a court to compare the rough values of what was given and what was received in exchange."  *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 448–49 (S.D.N.Y. 2014).  However, when transfers are made pursuant to a separation agreement incorporated in a divorce judgment, "'fair consideration' is inferred as a

---

[9] Plaintiff has also submitted an expert report; while it challenges the methodology and assumptions in the defendant's expert report, plaintiff's report does not present a competing valuation.  Pl.'s Expert Report at 6–10, Dkt. 71-22.  In any event, a reasonable finder could accept the conclusions reached by defendants' expert, and I therefore accept those conclusions for purposes of evaluating plaintiff's motion for summary judgment.

matter of law." *In re Ciancarelli*, slip op. at 10; *see also Commodity Futures Trading Com'n v. Walsh ("Walsh III")*, 658 F.3d 194, 199 (2d Cir. 2011) (recognizing that the New York Court of Appeals in *Commodity Futures Trading Com'n v. Walsh ("Walsh II")*, 17 N.Y.3d 162, 176 (N.Y. 2011), "held that a presumption of fair consideration applies in assessing divorce settlements"); *Durand v. Ackerman*, 2010 WL 3834587, at *7 (E.D.N.Y. Sept. 27, 2010) ("[T]ransfers made pursuant to a valid separation agreement incorporated into a divorce decree are presumed to have been made for fair consideration."); *Darling v. Darling*, 869 N.Y.S.2d 307, 320 (N.Y. Sup. Ct. 2008) ("[W]here the transfer is incorporated into a divorce decree, provisions such as appear in the Darlings' divorce Judgment[, such as those concerning the division of property and waiver of spousal support,] are sufficient to establish *prima facie* that the transfer was made for fair consideration.").

The presumption of fair consideration is appropriate in the context of a divorce judgment because of "'the myriad types of consideration that arise in the unique context of marital dissolution,' including the bedrock principles of equitable distribution recognizing marriage as 'an economic partnership to which both parties contribute as spouse, parent, wage earner or homemaker.'" *Walsh IV*, 3 F. Supp. 3d at 77 (quoting *Walsh II*, 17 N.Y.3d at 171). "Moreover, implicit in the exception to the fraudulent conveyance law is the notion that a wife definitely gives up something of value when she signs a separation agreement which …includes a waiver of her rights." *In re Ciancarelli*, slip op. at 23 (internal quotation marks and citation omitted). Although courts will decline to apply the presumption when parties fail to present a divorce decree, *In re Gamaldi*, 2009 WL 961417, at *11 (Bankr. E.D.N.Y. Apr. 7, 2009), or when the separation agreement is not incorporated into a divorce decree, *Durand*, 2010 WL 3834587, at *7, neither is the case here.

Courts may conduct a more searching comparison of the values exchanged by parties to a divorce when the consideration is of "minimal or inconsequential value." *See Gamaldi*, 2009 WL 961417, at *10–*11.  Moreover, the presumption does not eliminate the fair equivalency analysis, but merely changes it to one that assesses the credibility of the exchange in the context of the "myriad types of consideration" that may be transferred when a marriage dissolves.  Thus, for example, the Second Circuit based its finding of fair equivalence in *Malin* on the separation agreement's "earmark[s] of a 'bargained for' contract, particularly in the non-boilerplate language relating specifically to this couple and their children."  802 F.2d at 20.  The court also credited the more abstract benefits conferred on the husband in exchange for property transferred to his wife, noting that "the house he gave up would provide a home for his minor child" and that "he received an uncontested divorce and the freedom to remarry in exchange for a house, alimony and other benefits."  *Id.* at 20.  Likewise in *Walsh IV*, the court's analysis of the exchange acknowledged the "numerous forms of intangible and nonmonetary consideration" arising from the wife's "multitude of services and support…provided to the [] family during the 23 years preceding the [] separation."  3 F. Supp. 3d at 77.  The court also looked past the plain terms of the agreement to its impact on the parties, by, for example, recognizing that their agreement to waive rights to future maintenance "worked to the disadvantage of the [ex-wife] as the non-earning spouse."  *Id.* at 76.  Importantly as well, the divorce in *Walsh IV* involved "two-year-long negotiations evidencing a vigorously contested division of marital assets," that removed any doubt that this was a "real marriage that ended in a real divorce."  *Id.* at 78.

In contrast, the court in *Nirelli* declined to find an exchange of fair consideration, even though it acknowledged that "[t]he transfer to an ex-wife by a husband of all of his interest in marital property as payment for child support is not a fraud on creditors, as it is supported by

valid consideration."  1997 WL 718443, at *3.  After considering the circumstances at issue in

that case, the court concluded that a husband's transfer of the marital home was fraudulent

because, in addition to the transfer agreement being oral rather than written, the parties failed to

make any "rudimentary effort to figure out what [the husband] was giving and what [the wife]

was getting."  *Id.* at *5.

Applying these precedents here, I conclude that there are sufficient questions of fact with

respect to fair equivalence, especially when considered in light of the presumption, to defeat

plaintiff's motion for summary judgment.  First, and most significantly, defendants have

submitted a divorce judgment which incorporates their First 2013 Separation Agreement, and

this gives rise to a presumption of fair consideration.  Second, though the separation agreement

contains several general provisions, it also includes estimates of the value of each of defendants'

properties, thus indicating that the couple gave due consideration to the value of the properties

when they entered into their agreement.  The agreement also memorializes a clear exchange of

significant value: Jennifer acquired the three properties in her own name, but also assumed all

the responsibility for the children's expenses and surrendered any claim to Pawel's business.  *See*

Reply Affidavit of Jennifer Capala ¶ 20, Dkt. 95 ("I took on the responsibility of our real estate

and the children and he was free to keep his business and live his life without a single obligation

then, now and in the future to us.").  The expert report submitted by defendants opines that Pawel

avoided obligations valued at more than $750,000 in exchange for surrendering his interests in

any of the three properties, which—if defendants' valuations are accepted—were worth

approximately $1,734,000 at the time of the divorce.  Even assuming Pawel was entitled to half

the value of the properties, $750,000 is not substantially less than that amount.

Moreover, the circumstances that Jennifer describes as leading defendants to divorce arguably justify Jennifer receiving greater value than Pawel. Pawel's possible guilt about his extra-marital affair, his desire to continue that relationship without interference from Jennifer, and his optimism about his future business prospects—whether or not well-founded—may have led him to agree to Jennifer's demands and obtain a speedy end to his marriage. *See In re Zerbo*, 397 B.R. 642, 654 (Bankr. E.D.N.Y. 2008) ("[D]ivorcing parties divide assets for many reasons other than achieving economic equivalency. Among these are…the necessity of bringing closure to what can be a difficult, expensive, emotional and energy consuming process.").

Finally, Jennifer has raised an affirmative defense asserting that a considerable portion of the value of the properties is her separate—and not marital—property. As discussed below, this affirmative defense raises questions of material fact that cannot be resolved on summary judgment. If accepted, of course, this affirmative defense would substantially reduce the value of Pawel's interest in the properties and render more equivalent the consideration exchanged in the final judgment of divorce.

3. Good Faith

A demonstration of fair consideration also requires the transferee—here, Jennifer—to establish that she received the property in good faith. *Pergament as Tr. of Estate of Barkany v. Marina Dist. Dev. Co., LLC*, 2018 WL 5018654, at *13 (E.D.N.Y. Oct. 15, 2018). "[T]he statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995). In addition,

> [a] lack of good faith can be established by one of the following factors: (i) a lack of honest belief in the propriety of the transfer in question; (ii) an intent to take unconscionable advantage of others; or (iii) an intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others.

*Geo-Grp. Commc'ns, Inc. v. Chopra*, 2018 WL 3632498, at \*7 (S.D.N.Y. July 30, 2018) (internal quotation marks and citation omitted).  Implicit in each of these factors is the suggestion that the transferee was conspiring with the debtor rather than receiving property to which he or she was entitled in satisfaction of an antecedent debt.

Here, as demonstrated above, material issues of fact remain as to whether Jennifer received the transferred properties in the good faith belief that she was legitimately entitled to them.  *See Marine Midland Bank-N.Y. v. Batson*, 332 N.Y.S.2d 714, 718 (N.Y. Sup. Ct. 1972) ("There seems…no overriding policy for favoring commercial creditors over the separated wife who is another type of creditor and no less deserving of protection.").  Simply put, even if Jennifer acted to protect the properties from the judgment creditors in the *Gortat* litigation, that would not necessarily constitute bad faith.

I note as well that the Second Circuit has "discouraged efforts 'to assert lack of good faith' as an 'independent ground' for voiding transactions."  *Pergament as Tr. of Estate of Barkany*, 2018 WL 5018654, at \*13 (citing *HBE Leasing Corp.* 48 F.3d at 636).  Rather, noting that "[g]ood faith is an elusive concept in New York's constructive fraud statute," the Circuit has concluded that "bad faith does not appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.'"  *In re Sharp*, 403 F.3d at 54.

For all these reasons, I respectfully recommend denying plaintiff's motion for summary judgment under Section 273-a because material questions of fact remain as to whether the property transfers were supported by fair consideration.

*B.  DCL § 276*

"Even where fair consideration is given in exchange for the debtor's property, a transfer may be fraudulent…if it is marked by 'actual fraud,' that is, if it is made 'with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors'" in violation of DCL Section 276.  *HBE Leasing*, 48 F.3d at 633–34.  Actual fraud must be demonstrated through clear and convincing evidence.  *Id.* at 639.  Courts may, though, "infer fraud from the circumstances surrounding the transaction, commonly referred to as the badges of fraud."  *Ross Prod. Div.*, 2007 WL 9710316, at *3 (internal quotation marks and citation omitted).  Apart from inadequate consideration, these "badges" include:

> (i) transfers to relatives or close friends of the transferor; (ii) suspicious timing of the transfers or transfers that are unusual or hasty; (iii)…(iv) whether the transfers rendered the transferor insolvent; and (v) the transferor's retention of possession, benefit, or use of the property transferred."

*Id.* at *3–4 (quoting *Aaron v. Mattikow*, 225 F.R.D. 407, 413 (E.D.N.Y. 2004)).  The focus under DCL Section 276 is on the intent of the transferor—here, Pawel.  *In re Chin*, 492 B.R. 117, 130 (Bankr. E.D.N.Y. 2013).

Clearly, as plaintiff points out, there are compelling badges of fraud here: the interests in the properties were transferred from one spouse to the other, the transfers took place right after the jury verdict imposing liability on the defendants in *Gortat*, Pawel continued to reside at Spencertown,[10] and Pawel was no doubt aware at the time of the transfers of the claims against him in *Gortat* and his inability to pay the judgment that would soon be entered.   Plaintiff further attempts to show that defendants' divorce was motivated by an intent to defraud creditors rather than by genuine marital difficulties by citing deposition testimony given by Jennifer's mother,

---

[10] Jennifer and Pawel acknowledged in deposition testimony that they "are at the same address" and that Pawel was living at Spencertown from the middle of 2016 until 2018, the time of the deposition.  Jennifer Dep. Excerpt at 139:9-11; Pawel Dep. Excerpt at 95:22–96-2.

29

Gesine Krogh, in which she states that she was surprised by Jennifer's divorce and did not learn

of the couple's marital problems until after the divorce took place.  *See* Pl.'s Mem. Supp at 10, n.

6; Krogh Dep. at 103:2-25.

Whether Pawel and Jennifer genuinely sought to dissolve their marriage at or about the

time of the jury verdict in *Gortat* is a question of fact that cannot be resolved on summary

judgment.  Jennifer's decision not to share her marital difficulties with her mother is hardly

conclusive proof that those difficulties were conjured rather than real.  Likewise, Pawel's

continued presence at Spencertown does not irrefutably prove fraudulent intent; the presence of a

guest house on the property and the couples' claim that Pawel's presence is intended to help

guide their troubled son raises a question of fact with respect to Pawel's state of mind.

Finally, it appears that Jennifer, who apparently came from an affluent family, was in a

far better position than Pawel to provide for the couple's children.  This, combined with the

questions of fact regarding her separate property affirmative defense (discussed below), suggest

that Pawel may have transferred his interests in the properties to ensure the well-being of his

children and in acknowledgement of the fact that Jennifer's family wealth was the means with

which the properties were acquired in the first place.  As at least one court has noted, "wishing to

provide for one's family is not the same thought as intending to hinder creditors."  *In re Lindsay*,

2010 WL 1780065, at *13.

Plaintiff argues that his motion for summary judgment should be granted because similar

facts led the court to set aside conveyances as fraudulent in *Matter of Russo*, 1 B.R. 369 (Bankr.

E.D.N.Y. 1979).  Pl.'s Mem. Supp. at 10–11.  The holding in *Russo*, though, was based on facts

found after a trial was held.  *See, e.g.,* 1 B.R. at 375 (referencing testimony of the bankrupt given

on cross-examination by the trustee's counsel).  The decision accordingly offers no support for granting summary judgment in a case where material facts are in dispute.

For all these reasons, I respectfully recommend denying plaintiff's motion for summary judgment under Section 276.

### C. Separate Property Affirmative Defense

Finally, plaintiff moves for summary judgment dismissing Jennifer's separate property affirmative defense.  I respectfully recommend denying this aspect of plaintiff's motion as well.

 "[T]o challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial," plaintiff must show that there is an absence of evidence as to an essential element of the defense. *Nw. Mut. Life Ins. Co. v. Fogel*, 78 F. Supp. 2d 70, 73 (E.D.N.Y. 1999) (quoting *Fed. Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)). Though "whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.'" *Giammettei*, 34 F.3d at 54 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the movant is able to satisfy its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 593 (D. Conn. 2019) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

Jennifer argues the value of the properties transferred to her cannot include her "separate property," which consists of the Hillsdale property and a portion of the value of the Brooklyn property.  Defs.' Mem. Opp. at 4, 7, 10.  "Separate property" is defined under New York law as "property acquired before marriage or property acquired by bequest, devise or descent, or gift

31

from a party other than the spouse." N.Y. Dom. Rel. § 236(B)(1)(d)(1). Marital property, in contrast, is defined as "all property acquired by either or both spouses during the marriage" and before entering into a separation agreement or filing for divorce. N.Y. Dom. Rel. § 236(B)(1)(c). In the course of a divorce, marital property is "distributed equitably between the parties," while separate property "shall remain such." N.Y. Dom. Rel. § 236(B)(5)(b)–(c).

Under New York law, property acquired during marriage is presumed to be marital property. *Tsigler v. Kasymova*, 73 A.D.3d 1159, 1159–60 (2d Dep't 2010). Thus, the use of separate property to provide a down payment for the purchase of property does not necessarily protect that property from equitable distribution. "Even where one spouse contributed monies derived from separate property toward the acquisition of the marital residence, this has not precluded its classification of marital property where the other spouse made economic or other contributions to the residence and the marriage." *Fields v. Fields*, 15 N.Y.3d 158, 166 (N.Y. 2010). Separate property brought into a marriage may also become marital property through actions of the titled spouse such as "depositing otherwise separate funds into a joint marital account and utilizing them for marital expenses." *Spera v. Spera*, 71 A.D.3d 661, 664 (2d Dep't 2010). Generally, though, a spouse who provides separate property to make a down payment or to maintain real property will be awarded a credit for the separate property contribution before equitable distribution of the remaining value of the asset. *Fields*, 15 N.Y.3d at 167; *Beardslee v. Beardslee*, 124 A.D.3d 969, 969 (3d. Dep't 2015). The credit will ordinarily include appreciation, or "the increase in value of separate property," unless "such appreciation is due in part to the contributions or efforts of the other spouse." N.Y. Dom. Rel. § 236(B)(1)(d)(3).

Here, the extent of Jennifer's separate property remains, at a minimum, an open question of fact. Defendants have presented uncontradicted sworn statements that the couple relied on

Jennifer's separate family resources to raise the $70,000 used to purchase Hillsdale. Jennifer Aff. ¶¶ 25–29. Jennifer further asserts that her separate property was the source of the $80,000 down payment used to acquire the Brooklyn property; at the time, Jennifer was a photographer making $30,000–$40,000 a year and Pawel was a construction worker trying to start his own business, suggesting that neither had sufficient income to provide the down payment without the help of Jennifer's separate family funds. Jennifer Aff. ¶¶ 4–10; Pawel Aff. ¶ 13; Complete Dep. Of Pawel Capalaat 158:8-13, Dkt. 77-12. In addition, Jennifer has submitted receipts from renovations made to the Brooklyn property from 1996 to 2005. Receipts, Dkt. 77-6. Though the receipts do not paint a clear—or even consistent—picture, there are enough receipts bearing Jennifer's signature and checks drawn on an account in her name alone to allow a finder to conclude that at least some of the renovations to the Brooklyn property were funded with Jennifer's separate property. *See, e.g.,* Receipts[11] at 38, 41, 50, 55, 65, 116. While the Brooklyn deed was in both spouses' names, *see* Deeds at 3–4, this fact does not foreclose the possibility that Jennifer may be entitled to a separate property credit. *See Rosenberg v. Rosenberg*, 145 A.D.3d 1052, 1055 (2d. Dep't 2016) (awarding spouse a separate property credit for her contribution to the down payment used to purchase the marital home even though the home was titled in both spouses' names).

Plaintiff stresses that, in the context of New York divorce proceedings, "[w]hen an asset is acquired during the marriage, the party's own testimony that the source of the funds used to acquire it are premarital or separate property, without more, is insufficient to overcome the presumption that the property is marital property." *Marshall v. Marshall*, 91 A.D.3d 610, 611 (2d Dep't 2012); *see also* Pl.'s Mem. Supp. at 19–20. Here, Jennifer has presented more than her

---

[11] The page numbers are not included in the document but refer to the PDF filed on ECF, Dkt. 77-6.

own testimony; Pawel's testimony corroborates her own, as do the checks for renovation expenses drawn on Jennifer's own account.  In any event, review of a summary judgment motion in a fraudulent conveyance action presents considerations different from those in a divorce proceeding.  The question before the Court is not how to distribute the property equitably between two divorcing spouses, but whether there are genuine questions of material fact with respect to Jennifer's separate property defense.

Thus, I respectfully recommend denying plaintiff's motion for summary judgment as to Jennifer's separate property affirmative defense.

### III.   Defendants' Cross-Motion for Summary Judgment

Lastly, I recommend denying defendants' cross-motion for summary judgment.  In cross-moving for summary judgment, defendants make two principle arguments: 1) that Pawel received "reasonably equivalent value" for the transfers; and 2) that, even if he did not receive "reasonably equivalent value," the defendants' settlement agreement as incorporated by the state divorce judgment conclusively establishes that he received "reasonably equivalent value" for the transfers since there was no extrinsic fraud or collusion.[12]  Defs.' Mem. Supp. at 10, 15.  As an initial matter, "[f]air consideration" under New York's DCL and "reasonably equivalent value" under the Bankruptcy Code, Section 548(a)(1)(B)(i), "have substantially the same meaning."  *In re Akanmu*, 502 B.R. 124, 131 (Bankr. E.D.N.Y. 2013).

Defendants' first argument fails for the same reasons that plaintiff's argument under DCL Section 273-a fails.  *See* Section II(A).  The material issues remaining as to the value exchanged

---

[12] In making this argument, defendants overstate the law in *Zerbo*, essentially taking the position that a divorce judgment and consistent testimony from alleged co-conspirators insulates transfers from avoidance.  *See* Defs.' Mem. Supp. at 17–19.  Yet, "the dissolution of marriage was certainly never intended to be a vehicle to [a]ffect a fraudulent end, or to transmute that which would otherwise be fraudulent into something lawful."  *United States v. Barrier Indus. Inc.*, 991 F. Supp. 678, 681 (S.D.N.Y. 1998) (internal quotation marks omitted).

between Jennifer and Pawel prevent the court from finding on summary judgment that the transfers were supported by "fair consideration" or "reasonably equivalent value." This result is especially clear when drawing all reasonable inferences in the plaintiff's favor; in this light, a reasonable finder could easily conclude based on the suspect timing of the property transfers that Jennifer did not act in good faith.

The second argument fails for the same reasons plaintiff's argument under DCL Section 276 fails. To support their contention that a division of marital assets conclusively establishes reasonable value, defendants rely on *In re Zerbo*. *See* Defs.' Mem. Supp. at 15. But *Zerbo* states that a divorce decree conclusively establishes reasonably equivalent value only absent extrinsic fraud or collusion. 397 B.R. at 654. Here, genuine issues of fact remain as to whether the transfers were actually fraudulent and whether Pawel colluded with Jennifer to conjure a divorce agreement that would shield the couple's joint assets from Pawel's creditors. Specifically, the existence of several badges of fraud, including the intra-family transfer, the timing of the conveyances immediately following the jury verdict, Pawel's continued presence at the marital home, and the modification of the couple's divorce decree five years after the fact and apparently to further their position in this litigation, precludes summary judgment in defendants' favor.

Defendants also contend they are entitled to summary judgment on Jennifer's separate property affirmative defense because "the testimony of the divorcing parties is undisputed." Defs.' Mem. Supp. at 5. In support of this contention, defendants rely on *Robertson v. Robertson*, 186 A.D. 124 (2d Dept. 1992). In *Robertson*, however, the two spouses were adversaries in their own divorce proceeding, and their agreement with respect to the wife's separate property was accordingly unopposed. Here, of course, plaintiff contends that Pawel and

Jennifer worked together to defraud Pawel's creditors.  Defendants' reliance on *Robertson* is therefore misplaced.

For all these reasons, I respectfully recommend that the defendants' cross-motion for summary judgment be denied.

### CONCLUSION

For the reasons stated above, I respectfully recommend that the parties' cross-motions for summary judgment be denied in all respects.

Any objections to the recommendations made in this Report must be made within fourteen days after filing of this Report and Recommendation and, in any event, on or before August 20, 2020.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
August 6, 2020

*U:\#ECC 2019-2020\17-cv-3434 Pereira, Chap 7 v. Capala et al\Pereira 17-cv-3434 FINAL RR.docx*